OPINION
{¶ 1} Michael and Jacqueline Gaskins ("the Gaskins") appeal from a judgment of the Montgomery County Court of Common Pleas, which awarded them $1,000 in damages for the breach of a real estate sales contract.
 {¶ 2} The parties have stipulated to the following facts:
 {¶ 3} The Gaskins are the owners of the real estate located at 3370 Benchwood Road, Dayton, Ohio 45414 (the "Gaskins' property"). On or about August 12, 2001, John R. Young, acting as an authorized agent of Ohio Valley AFM, Inc., and Petro Ventures, Inc. (collectively, "the Buyers"), executed a contract to purchase three parcels of real estate — the Gaskins' property and two additional properties located at 3380 Benchwood Road and 3400 Benchwood Road. (The two additional properties are owned by other individuals and are not at issue in this lawsuit.) Petro Ventures and Ohio Valley AFM are affiliated companies. The Gaskins' property was being purchased for the account of Petro Ventures or Ohio Valley AFM, or a corporation to be formed which would be affiliated in some way with them. James Stark and Invest Mark, Inc., were agents of the Buyers. Wayne Davis and The Realty Group were agents of the Gaskins.
 {¶ 4} The contract at issue is a two-page document, consisting of a Commercial Real Estate Sale Agreement and an Inspection Addendum. Among the pre-printed terms of the Agreement, the Buyers agreed to purchase the Gaskins' property for $385,000. (The additional two properties were to be purchased for $385,000 and $185,000.) The Buyers further agreed to deposit $1,000 per parcel (totaling $3,000) in their broker's trust account as earnest money deposits. That provision further stated:
 {¶ 5} "If the closing does not occur because of Seller's default or because any condition of the Contract is not satisfied or waived, Purchaser shall be entitled to the Earnest Money. If Purchaser defaults, Seller shall be entitled to the Earnest Money. * * * Payment or refund of the Earnest Money shall not prejudice the rights of the Broker(s) or the non-defaulting party in an action for damages or specific performances against the defaulting party."
 {¶ 6} In addition, the Buyers reserved the right to conduct inspections of the property, as detailed in the Inspection Addendum. In paragraph 1 of the Inspection Addendum, the Buyers were allowed ninety calendar days to conduct physical inspections, an inspection for lead-based paint, and to conduct an environmental assessment. The Addendum further provided: "If Purchaser's inspections of the Property disclose any matters to which Purchaser reasonably objects, Purchaser shall notify Seller in writing specifying the objections prior to the expiration of the applicable inspection period. * * * FAILURE TO NOTIFY SELLER OF ANY OBJECTIONS BEFORE EXPIRATION OF THE APPLICABLE INSPECTION PERIOD SHALL CONSTITUTE A WAIVER OF SUCH OBJECTIONS AND PURCHASER SHALL TAKE THE PROPERTY `AS IS' WITH RESPECT TO SUCH MATTERS." In the event that the Buyers timely objected, the sellers were permitted sixty days to cure the matters to which the Buyers had objected. If the sellers were unwilling or unable to cure those matters, the Buyers were permitted to cancel the contract. Under the general provisions paragraph of the Agreement, the parties agreed that time was of the essence as to all of the provisions in the contract.
 {¶ 7} At the bottom of the Inspection Addendum, the parties included additional handwritten terms. Paragraph B provided that the contract was "subject to buyer performing a site study with the outcome to buyers [sic] satisfaction." Paragraph E stated: "All contingencies shall be removed at the end of 90 days. A non-refundable deposit of $25,000 per parcel shall be placed in escrow with a title company of buyers [sic] choice at the end of 90 days." The closing for the delivery of the deed and the payment of the balance of the purchase price was to be held on or before February 1, 2002.
 {¶ 8} On August 18, 2001, the Gaskins accepted the offer to purchase their property, and the accepted original contract was re-delivered to the Buyers' agent on August 20, 2001. That same day, Stark forwarded copies of the "contracts" to Young. Pursuant to the contract, Ohio Valley AFM delivered three checks in the amount of $1,000 each to Invest Mark as payment of the $1,000 earnest money deposit for each of the three properties.
 {¶ 9} Prior to November 7, 2001, the Buyers performed studies and found the results to be unsatisfactory. On either November 7, 2001 or November 14, 2001, Stark phoned Davis (the Gaskins' agent) and told him that Petro Ventures was no longer interested in the deal regarding the three properties.
 {¶ 10} On November 15, 2001, an internal memorandum was generated by Donna to Ray Lynch, in Ohio Valley AFM, referencing a request for a release letter on "AFM letterhead." On November 21, 2001, a letter dated November 19, 2001, was sent via facsimile from Young to Stark, indicating that Ohio Valley AFM had no further interest in the three properties (including the Gaskins' Property). No written or oral notice was given by any of the Buyers or their representatives to the Gaskins or their representatives that there were any objections to the property, as disclosed by any inspections or studies of the property. No written notice was ever given by any of the Buyers or their representatives to the owners of the additional two parcels or their representatives regarding the termination of the contract. The owners of the additional two parcels authorized the return of the Buyers' $1,000 earnest money deposits for those parcels.
 {¶ 11} On behalf of the Gaskins, attorney Alan A. Biegel sent a letter, dated January 18, 2002, to Young, demanding payment of the $25,000 non-refundable deposit referred to in the contract. Prior to filing an answer in this case, no written or oral response was ever made by any of the Buyers or their representatives to the demand letter. The Buyers never deposited the sum of $25,000 per parcel in escrow at the end of the ninety days.
 {¶ 12} In the Gaskins' opinion, the value of their property at the time that the Buyers declined to purchase it was $350,000.
 {¶ 13} On April 16, 2002, the Gaskins filed suit against Young, Petro Ventures, and Ohio Valley AFM, based on an alleged breach of the real estate sales contract. The Gaskins requested specific performance of the contract and $25,000, representing the non-refundable deposit that should have been paid at the expiration of the ninety days. On July 18, 2002, the Gaskins filed a supplemental complaint, specifically alleging breach of contract and requesting damages in an amount not less than $25,000.
 {¶ 14} The case was submitted to a magistrate on the stipulated facts. On July 10, 2003, the magistrate ruled that the Buyers had breached the real estate contract. The magistrate rejected the Buyers' argument that written notification was not required and concluded that, under the clear terms of the contract, "[t]he Defendants had ninety days to complete site tests and notify the Plaintiff in writing whether or not he [sic] wished to purchase the properties based on those site tests. The parties agree that the Defendants did not respond inwriting within this ninety day period, as required." (Emphasis sic.) Because the contract provided that time was of the essence, the magistrate concluded that "the Defendants breached the contract by not notifying the Plaintiff in writing within that ninety day period that it was disinterested in the property." (Emphasis sic.)
 {¶ 15} As for damages, the magistrate rejected the Gaskins' argument that the required $25,000 deposit should be awarded as liquidated damages. The court noted that the contract made no reference to liquidated damages but that it specified that the earnest money deposit should be kept by the seller if the purchaser defaulted. Following our decision in Cochran v.Schwartz (1997), 120 Ohio App.3d 59, 696 N.E.2d 656, the magistrate concluded that only the $1,000 earnest money deposit was contemplated as liquidated damages in the event of default. Accordingly, the magistrate awarded $1,000 to the Gaskins as damages for the Buyers' breach.
 {¶ 16} Both the Gaskins and the Buyers filed objections to the magistrate's decision. The Buyers objected to the magistrate's finding that they were required to notify the Gaskins in writing that they did not want to proceed with the purchase, and that the Gaskins were entitled to retain the earnest money deposit. The Gaskins argued that the magistrate erred in finding Cochran controlling and in awarding $1,000. They asserted that their damages should not be determined as of the time the contract was entered into but, rather, at the time of the breach. The Gaskins also challenged the magistrate's failure to give weight to their opinion of the value of their property at the time of the breach.
 {¶ 17} The trial court overruled each of the objections. As for whether a breach had occurred, the trial court likewise found that "the Defendants were required to notify the Plaintiffs in writing within ninety (90) days if they were not satisfied with the site study." Noting that time was of the essence, the court similarly concluded that "in failing to notify the Plaintiffs in writing within ninety (90) days, the Defendants breached the contract." Having concluded that the Buyers had breached the contract, the trial court noted that specific performance was unavailable, because only one of the three property-owners involved in the contract was a party to the action. Addressing the proper amount of damages, the court looked to the contract to determine whether the parties had included a liquidated damages provision. The trial court applied the three factors for evaluating liquidated damages provisions set forth in Jones v.Stevens (1925), 112 Ohio St. 43, and concluded that the earnest money provision constituted a liquidated damages clause but the non-refundable deposit clause did not. The court further found the contract to be reasonable. The court therefore concluded that the Gaskins were entitled to the $1,000 earnest money. As for the Gaskins' opinion as to the value of their property, the court overruled their objection, stating:
 {¶ 18} "The Plaintiff's property was not the only property involved in the contract. The Court finds that the value of the Plaintiff's property may have been affected by the sale of the other two properties that were the subject of the contract. The Plaintiffs are not in a position to give an opinion as to the value of their property as it may or may not have been affected by the other two properties."
 {¶ 19} The Gaskins raise two assignments of error on appeal.
 {¶ 20} "1. The lower court erred in finding the parties intended that the earnest money provision of their contract represented a liquidated damage provision."
 {¶ 21} In their first assignment of error, the Gaskins challenge the trial court's determination that the earnest money provision in the contract constituted a liquidated damages clause.
 {¶ 22} "Liquidated damages are an agreed upon amount of money to be paid in lieu of actual damages in the event of a breach of contract." (Emphasis added.) Connour v. Steel, Montgomery App. No. 19632, 2004-Ohio-1162, ¶ 26.
 {¶ 23} As noted by the Gaskins, we previously addressed provisions for the retention or forfeiture of earnest money inCochran and Hussey v. Daum (Dec. 28, 1998), Montgomery App. No. 17148. In Cochran, Gary Schwartz had entered into a contract to purchase a duplex from the Cochrans, using a form approved by the Dayton Area Board of Realtors. Pursuant to the contract, Schwartz delivered $5,000 to the real estate broker as an earnest money deposit. Schwartz subsequently defaulted on the contract, and the Cochrans brought suit to recover the $5,000 earnest money deposit. The Cochrans ultimately sold the duplex for an amount identical to the contract price with Schwartz. The trial court awarded the deposit to the Cochrans, and Schwartz appealed, arguing that the trial court had erred when it awarded "liquidated damages" without determining whether the Cochrans had sustained any injury.
 {¶ 24} The contract in Cochran contained an identical earnest money provision to that contained the contract at issue herein. To reiterate, the provision stated:
 {¶ 25} "If the closing does not occur because of Seller's default or because any condition of the Contract is not satisfied or waived, Purchaser shall be entitled to the Earnest Money. If Purchaser defaults, Seller shall be entitled to the Earnest Money. * * * Payment or refund of the Earnest Money shall not prejudice the rights of the Broker(s) or the non-defaulting party in an action for damages or specific performances against the defaulting party."
 {¶ 26} In addressing this provision, we discussed several cases which had enforced — in the absence of any out-of-pocket dollar loss — a provision for the retention or forfeiture of the earnest money deposit upon default. Those courts enforced the provision as "a reasonable liquidated damages provision." Id., citing Higgs v. United States (Ct.Cl. 1976), 546 F.2d 373, andCurtin v. Ogborn (1979), 75 Ill.App.3d 549, 394 N.E.2d 593. We likewise concluded that the $5,000 earnest money deposit at issue was "a reasonable liquidated damages provision, and [was] therefore enforceable" against Schwartz, although we stated that the 7.25 percent ratio between the earnest money deposit and the purchase price "push[ed] the envelope." We emphasize that we were addressing "the enforceability of a provision in a real estate contract for the retention of earnest money by the vendor in the event of default by the vendee" in the absence of actualdamages. We were not faced with a situation where the non-defaulting party suffered damages in an amount greater than the earnest money deposit.
 {¶ 27} That situation arose in Hussey. In that case, the Husseys entered into a contract with the Daums to sell their home for $260,000. The Daums breached the contract by refusing to purchase the property. The Husseys subsequently received but rejected an offer from another buyer in the amount of $241,800. The Husseys ultimately sold their home for $233,500. In the parties' third appearance before us, we affirmed the trial court's determination that the sellers had suffered damages in the amount of $18,200, which was based on the sentence in the sales contract that the payment or refund of earnest money shall not prejudice the rights of the non-defaulting party in an action for damages. We further rejected the Daums' argument that the earnest money deposit of $1,000 was the total measure of damages available to the Husseys.
 {¶ 28} In an application for reconsideration, we again rejected the Daums' argument that the Hussey's damages were limited to the $1,000 deposit. Hussey v. Daum (Feb. 4, 1999), Montgomery App. No. 17148. We distinguished Cochran, stating:
 {¶ 29} "In the Cochran case, the listed property eventually sold after default for the contract price, and the only issue in the case, therefore, was whether the seller or the purchaser should receive the `earnest money' which had been placed in escrow pursuant to the contract. However, in the present case, the property eventually sold for substantially less than the contract price thus activating the general rule of damages which is ordinarily applied to real estate contracts in Ohio and throughout the United States." Id.
 {¶ 30} Reading Cochran and Hussey together, it is clear that we do not interpret the earnest money provision at issue to constitute a liquidated damages provision which precludes the non-breaching party from pursuing actual damages. In other words, the earnest money provision does not specify an agreed amount of money which is to be paid in lieu of actual damages in the event of a breach of contract. Such a reading would contradict the unambiguous language in the last sentence of that paragraph, which expressly states that the non-defaulting party may pursue damages or specific performance against the defaulting party notwithstanding the payment or refund of the earnest money deposit.
 {¶ 31} The crux of our prior decisions is that a provision in a real estate contract which allows the seller to keep the earnest money in the event of a default by the buyer is enforceable where it is reasonable. In determining whether the earnest money provision is reasonable, we have looked to whether the payment or refund of the earnest money deposit would satisfy the considerations for reasonable liquidated damages. We note, however, that unlike liquidated damages, which constitute both the maximum and minimum damages available to the non-defaulting party, a reasonable (and, therefore, enforceable) earnest money provision sets forth the minimum, but not the maximum, damages. When actual damages exist, the non-breaching party may also pursue specific performance or actual damages.
 {¶ 32} Accordingly, in our judgment, the trial court erred in concluding that the earnest money provision constituted a liquidated damages provision which precluded the Gaskins from recovering for any actual damages that they may have suffered as a result of the breach.
 {¶ 33} The Gaskins' first assignment of error is sustained.
 {¶ 34} "2. The lower court erred in finding that the value of the appellants' property may have been affected by the sale of the other two properties which were also the subject of the purchase contract."
 {¶ 35} In their second assignment of error, the Gaskins challenge the court's finding that the value of their property may have been affected by the sale of the additional two properties which were also the subject of the contract. The heart of the Gaskins' argument is that the trial court should have determined damages based on the difference between the sale price and the fair market value of their property at the time of the breach, and that the fair market value should have been determined based solely on the Gaskins' stipulated opinion of their property's value.
 {¶ 36} Before addressing the merits of Gaskins' argument, the Buyers have raised two threshold issues. First, they assert that the Gaskins failed to properly assert a claim for actual damages before the trial court. In its decision, the trial court noted: "Plaintiffs, for the first time, argue that they are entitled to the difference in the contract price and the fair market value of their property at the time of the default." The Buyers point out that the Gaskins have stated on appeal that they "initially sought specific performance of the contract and, separately, a judgment for the $25,000 non-refundable earnest money deposit specified in the contract." The Buyers argue that the trial court had no obligation to convert the specific performance claim to a damages claim when specific performance was unavailable.
 {¶ 37} Although the Gaskins' initial complaint only sought specific performance and the non-refundable deposit, we note that they subsequently filed a supplemental complaint which expressly sought damages in an amount not less than $25,000. (We question why the Gaskins have failed to bring this claim to our attention and, instead, have emphasized their specific performance claim.) Moreover, the Gaskins requested actual damages from the trial court as part of their objections to the magistrate's decision, and the court addressed the proper measure of damages to be awarded. Although the court did not reach the question of actual damages due to its determination that the contract provided for liquidated damages, the Gaskins' request for actual damages was properly raised before the trial court.
 {¶ 38} Second, the Buyers assert that the Gaskins' request for actual damages ignores the nature of the breach found by the court. In finding that a breach had occurred, the trial court reasoned:
 {¶ 39} "In the present action, the Inspection Addendum of the contract at issue contains several paragraphs of typed provisions followed by additional handwritten terms and conditions. The typed language allows the purchaser ninety days to complete inspections of the property. Additionally, the purchaser must notify the seller in writing within the ninety days of any objections so that the seller has the opportunity to cure the objections. The handwritten language states `Subject to buyer performing a site study with the outcome to buyers (sic) satisfaction. . . . All contingencies shall be removed at the end of 90 days.' Comp. Ex. A. at p. 2
 {¶ 40} "The Court finds that the handwritten language of the contract does not contradict the typed language. The handwritten language is ambiguous to the extent that it does not specify whether the site study must be performed within ninety days and does not specify how to inform the Seller if it is not satisfied with the site study. However, the handwritten portion states that all contingencies are to be removed at the end of ninety days. Construing the handwritten language to be consistent with the typed language, the Court finds that the Defendants were required to notify the Plaintiffs in writing within ninety (90) days if they were not satisfied with the site study.
 {¶ 41} "Finally, the contract states that time is of the essence. Comp. Ex. A. at line 76. The Defendants did not notify the Plaintiffs in writing within ninety (90) days of any objections. In failing to notify the Plaintiffs in writing within ninety (90) days, the Defendants breached the contract."
 {¶ 42} The Buyers characterize the court's (and the magistrate's) ruling as stating that they had breached the real estate contract by providing oral notification to the Gaskins rather than by notifying them in writing. They argue that "neither the Magistrate nor the trial [c]ourt found that [the Buyers'] failure to consummate the sale was a breach of the contract." (Emphasis sic.) The Gaskins respond that the failure to notify them in writing was a "fundamental part of their agreement." Thus, they state that "[t]he only important part of that discussion at this time is the fact that a breach did occur. Its basis does not serve to either justify or minimize the [Buyers'] action."
 {¶ 43} In determining the proper amount of damages, the nature of the breach is critical to our analysis. If, as the Buyers argue, they substantially complied with the notification requirement and their only breach was their failure to providewritten notification, they would have properly exercised their right to unilaterally cancel the contract and the Gaskins would only be entitled to any damages that stemmed from the Buyers' failure to strictly comply with the contractual terms. SeeBerger v. Kelsey (Mar. 8, 1990), Clark App. No. 2622 ("where a contract has been substantially performed the contract price may be recovered, less damages for failure to perform strictly in compliance with a contract."). If, on the other hand, timely written notification was required in order to cancel the contract, neither the Buyers' timely oral notification nor their untimely written notification would relieve them of their obligations under the contract. Under this circumstance, the Gaskins would be entitled to the difference between the contractual sale price and the value of the property at the time of the breach. See Hussey, supra.
 {¶ 44} Here, the Buyers have not challenged the trial court's conclusion that the contract required them to notify the Gaskins in writing within ninety days if they were not satisfied with the site study. By emphasizing the Buyer's need to put their notification in writing, the court found that this term was material to the contract. The Buyers have stipulated that they had failed to provide such timely written notice. Although the trial court did not expressly so find, it follows that the Buyers' failure to provide timely written notification rendered their notification ineffectual. Thus, the Gaskins are entitled to damages based on the Buyers' ultimate failure to purchase the property — not just their failure to give timely written (as opposed to oral) notice.
 {¶ 45} We have stated that, "[o]rdinarily, the measure of damages for the breach of a real estate sales contract is the difference between the market value at the time of the default and the actual contract price of the real estate." Hussey (Dec. 28, 1998), supra, citing Roesch v. Bray (1988),46 Ohio App.3d 49, 545 N.E.2d 1301, paragraph one of the syllabus.
 {¶ 46} The Gaskins argue that the trial court should have credited their opinion of the value of their property at the time of the default. We agree. A property owner is competent to testify as to the value of his property. Leppla v. Sprintcom,Inc., 156 Ohio App.3d 498, 2004-Ohio-1309, 806 N.E.2d 1019, at ¶ 25; Jones v. Dayton Power Light Co. (Dec. 14, 1994), Greene App. No. 94-CA-49; Smith v. Padgett (1987), 32 Ohio St.3d 344,347, 513 N.E.2d 737. Moreover, that testimony alone is sufficient to establish the value of the owner's property. See Leppla,
supra, at ¶ 25 ("Although Leppla may not be the best witness to testify as to the effect the unlit cell tower had on the value of his property, his testimony is sufficient to avoid summary judgment. As noted above, Leppla is competent to testify as to the value of his property before and after the erection of the cell-phone tower.").
 {¶ 47} The Gaskins and the Buyers stipulated that, in the Gaskins' opinion, the value of the property at the time the Buyers declined to purchase it was $350,000. The Buyers agreed to that stipulation, and no contradictory evidence was presented. Accordingly, the trial court should have accepted that uncontradicted stipulation as evidence of the value of the Gaskins' property at the time of the breach. Crediting the Gaskins' valuation of their property, they are entitled to $35,000, representing the difference between the market value at the time of the default and the actual contract price of the real estate. The Gaskins are entitled to the $1,000 earnest money deposit as partial payment of their actual damages. See Rogersv. Lockard (Ind.App. 2002), 767 N.E.2d 982; Bannon v. Knauss
(1984), 282 S.C. 589, 320 S.E.2d 470 (earnest money deposit constitutes fund from which damages are partially paid if actual damages exceed the amount of the earnest money deposit).
 {¶ 48} The second assignment of error is sustained.
 {¶ 49} The judgment of the trial court will be reversed and that cause remanded for the trial court to enter judgment in the favor of the Gaskins in the amount of $35,000.
Fain, P.J. and Grady, J., concur.